UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

Plaintiff,

vs.

Case No.:
Honorable:
Mag. Judge:

$359,980.00 U.S. Currency

All Funds on Deposit ($41,427.00) from
Key Bank, Business Acct. #XXXXXXXX7862,

All Funds on Deposit ($51,138.38) from
PNC Bank, Business Checking Plus Acct.
#XXXXXX5589,

All Funds on Deposit ($42,659.53) from
DFCU Financial, Share/Deposit Acct.
#XXXXX7544,

All Funds on Deposit ($3,608.82) from
First Merchants Bank, Business Interest Checking
Acct. #XXXXX1664.

Defendants *in rem*.

---

## COMPLAINT FOR FORFEITURE

---

Plaintiff, the United States of America, states the following in support of this Complaint for Forfeiture:

## JURISDICTION AND VENUE

1. This is an *in rem* civil forfeiture action pursuant to 18 U.S.C. § 981(a)(l)(A) and 984.

2. This Court has original jurisdiction over this forfeiture action under 28 U.S.C. § 1345 because this action is being commenced by the United States of America as Plaintiff.

3. This Court has jurisdiction over this forfeiture action under 28 U.S.C. § 1355(b)(1)(A) and (B) because the acts giving rise to the forfeiture occurred in the Eastern District of Michigan and because the property was found in this district.

4. Venue is proper before this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Eastern District of Michigan.

5. Venue is also proper before this Court under 28 U.S.C. § 1395(b) because the Defendants *in rem* were found and seized in the Eastern District of Michigan.

## DEFENDANTS IN REM

6. The Defendants *in rem* consist of the following:

   a. $359,980.00 U.S. Currency,

   b. Key Bank, Business Acct. #XXXXXXXX7862, VL: $41,427.00;

c. PNC Bank, Business Checking Plus Acct. #XXXXXX5589, VL: $51,138.38;

d. DFCU Financial, Share/Deposit Acct. #XXXXX7544, VL: $42,659.53; and

e. First Merchants Bank, Business Interest Checking Acct. #XXXXX1664, VL: $3,608.82.

7. Members of the Drug Enforcement Administration ("DEA") seized the Defendants *in rem* on or about November 18–19, 2025.

8. The Defendants *in rem* are in the custody of the DEA.

**STATUTORY BASIS FOR CIVIL FORFEITURE**

9. 18 U.S.C. § 1956(c)(7) defines "specified unlawful activities" (SUA).

10. SUAs include any activity or act constituting an offense listed in 18 U.S.C. § 1961(1).

11. Controlled substance offenses, such as violations of 21 U.S.C. §§ 841 and 846, are specified unlawful activities.

12. 18 U.S.C. § 1956(a)(1)(B) prohibits knowingly conducting a financial transaction involving the proceeds of "specified unlawful activity," knowing that the transaction is designed in whole or in part to: conceal or disguise the nature, the location, the source, the ownership, or the control of such proceeds; or, avoid transaction reporting requirements.

13. 18 U.S.C. § 1957 prohibits knowingly engaging, or attempting to engage, in a monetary transaction with proceeds of a specified unlawful activity in an amount greater than $10,000 by, through, or to a financial institution.

14. 18 U.S.C. § 1956(h) makes it a crime for any person to conspire to commit any of the offenses set forth in 18 U.S.C. § 1956 and/or 18 U.S.C. § 1957.

15. 18 U.S.C. § 981(a)(1)(A) provides for the forfeiture of "Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

16. Forfeiture pursuant to this statute applies to more than just the proceeds of the crime. Forfeitures encompass all property "involved in" the crime, which can include untainted funds that are comingled with tainted funds derived from illicit sources.

17. The proceeds of Money Laundering are also subject to civil forfeiture under 18 U.S.C. §981(a)(l)(C) because Title 21 violations, or "dealing in a controlled substance," are specified unlawful activity as designated in 18 U.S.C. § 1956(c)(7)(A) by way of 18 U.S.C. §1961(1).

18. Recognizing that money is fungible, 18 U.S.C. § 984 provides that, in a civil forfeiture action against funds in an account in a financial institution, the United States need not identify the specific funds involved in the criminal offense. Rather, "any identical property found in the same…account as the property involved

in the offense that is the basis for the forfeiture shall be subject to forfeiture[.]"

## GENERAL ALLEGATIONS

### I. Background on money laundering organizations.

19. Money laundering organizations (MLO) operate like organized businesses.

20. MLOs often have "employees" and "divisions."

21. Each division has employees who are responsible for completing specific tasks such as employees who field requests to launder drug proceeds or to purchase items with drug proceeds, employees who direct couriers to travel and pick up and drop off drug proceeds, employees who act as couriers to travel and pick up drug proceeds, and employees who handle placement of the drug proceeds into the legitimate financial system.

22. MLOs often use employees to pick up drug proceeds in the form of bulk cash and deposit the drug proceeds into U.S. banks and purchase cashier's checks, certified bank checks, and money orders.

23. Once the drug proceeds are in the legitimate financial system, the MLO uses these funds to conduct its own business(es), for example, paying for products that are later sold for profit or transferring the funds into and out of other accounts.

24. MLOs employ low-level members, with specific tasks, to assist in laundering proceeds.

25. These low-level members also referred to as "money couriers" will travel to various cities to pick up drug proceeds under the direction of MLOs.

26. MLOs frequently communicate with money couriers via electronic devices.

27. The MLOs instructions are specific and brief. They instruct money couriers to pick up a set amount of proceeds from a set location and from a set point of contact.

28. When meeting with the contact to pick up bulk cash, it is not uncommon for these meetings to occur in random, public places and may even involve strangers (for example, a MLO money courier and a Drug Trafficking Organization (DTO) member) who may or may not have ever met before.

29. Once money couriers receive the drug proceeds, they verify that they have completed their task, often sending photographs or video of the proceeds or the exact amount of proceeds the money courier has received.

30. MLOs then provide the money courier specific instructions for depositing the proceeds, including providing account numbers and financial institution information to the money courier or instructions for purchasing products, such as vehicles.

31. The meetings between the participants often involve the production of a "token," which is known by both participants.

32. The use of a token represents secure confirmation to each of the participants that they have met the correct person, and the exchange of the token also represents receipt and proof the money was delivered as required by the MLO and DTO hierarchies.

33. The most common token used in these meetings is a U.S. dollar bill.

34. A U.S. dollar bill is commonly used because every single U.S. bill has a unique serial number. It is this unique serial number that represents the "token" used for confirmation.

35. For example, a MLO courier may be instructed to meet a DTO member at a business parking lot at a certain day and time to receive cash drug proceeds.

36. In advance of the meeting, the MLO will provide the unique token (the serial number of a U.S. dollar bill) to the DTO. At the meeting location, the MLO money courier will show the U.S. dollar bill to the DTO member, who has the cash drug proceeds, as proof the DTO member has met with the correct MLO money courier.

37. After the money courier picks up bulk cash drug proceeds, they often deposit the drug proceeds into U.S. banks and purchase cashier's checks, certified bank checks, and money orders.

38. The MLOs often use these funds to pay for products that are later sold for profit or transfer the funds into and out of other accounts.

## II. Facts supporting forfeiture.

39. Throughout 2025, DEA Detroit Task Force Group 2 (TFG2) investigated an international MLO with operations in the Detroit area.

40. The MLO conducted operations in the Eastern District of Michigan from in or around January 2025 through in or around November 2025.

41. TFG2 identified an unnamed individual (Individual 1) receiving bulk cash, represented to Individual 1 to be drug proceeds, for the purpose of sending the money to bank accounts overseas.

42. In or around August 20, 2025, TFG2 observed an unnamed individual (Individual 2), driving a dark colored Ford Fusion, with Michigan license plate ECP154, meet Individual 1 and enter Individual 1's vehicle to pick up suspected bulk cash from Individual 1.

43. Individual 2 entered Individual 1's vehicle for a few moments and exited Individual 1's vehicle with a plastic bag, which Individual 2 put in the trunk of the Ford Fusion with Michigan license plate ECP154.

44. Through surveillance photos and WhatsApp pen contacts, TFG2 identified Individual 2.

45. TFG2 received court authorization to place a GPS tracking device on the Ford Fusion with Michigan license plate ECP154.

46. On or around October 7, 2025, agents observed the Fusion previously

seen being operated by Individual 2 parked behind a residence at 10XXX Wayne Rd in Romulus, MI.

47. The Ford Fusion with license plate MI ECP154 is registered to an unnamed individual (Individual 3) who is known to agents to be a money launderer of drug proceeds.

48. On or around October 13, 2025, agents observed the Ford Fusion with Michigan license plate ECP154 and a white Toyota Prius with California license plate 9CFy625 parked at 10XXX Wayne Road.

49. The white Toyota Prius with California license plate 9CFy625 is registered to Muayad Jassim Al-Sarray.

50. Al-Sarray has a Michigan limited liability company registered at 10XXX Wayne Road called Brothers Auto Sales & Transportation LLC, and Al-Sarray has stayed overnight at this address.

51. The residence is owned by an unnamed individual (Individual 4), an individual known by agents to be connected to the MLO.

52. Agents have observed Al-Sarray staying at the Wayne Road address with Individual 2.

53. On or around October 22, 2025, TFG2 members conducted surveillance on the Fusion, known to be operated by Individual 2, and observed Individual 2 and another male, at the Wayne Road address, load large suitcases into the Fusion and

depart from the Wayne Road residence.

54. Agents terminated physical surveillance of the Fusion while TFG2 members monitored the court-authorized GPS tracking device previously installed on the Fusion.

55. Over the next four hours, GPS data showed the Fusion making stops at six banks, including the financial institutions where the defendants in rem were deposited.

56. During physical surveillance, agents observed a male matching the description of Al-Sarray exit the last bank the Fusion visited that day, leading agents to believe Al-Sarray made at least some of the bank stops with Individual 2.

57. Bank records illustrate that on or around October 22, 2025, Al-Sarray conducted the following transactions related to the defendant *in rem* bank accounts:

a. At approximately 9:00 a.m., GPS data showed the Fusion stop at First Merchants Bank at 7146 Pelham Rd, Taylor, MI. Financial records show that on the same date, Al-Sarray deposited $57,700 into defendant in rem First Merchants Bank account.

b. At approximately 10:07 a.m., GPS data showed the Fusion arrive at DFCU Financial located at 400 Town Center, Dearborn, MI. Financial records show that on the same date, Al-Sarray deposited

$61,700 into defendant in rem DFCU bank account. Of that, $43,815 was used to purchase a negotiable instrument.

c. At approximately 12:16 p.m., GPS data showed the Fusion arrive at the KeyBank located at 230 N Telegraph Rd, Dearborn, MI. Financial records indicate that on the same date, Al-Sarray deposited $68,800 into defendant in rem Key Bank account. Of that, $61,256 was used to purchase a negotiable Instrument.

d. Financial records show that on October 22, 2025, Al-Sarray deposited $65,300 to defendant in rem PNC Bank account at the Michigan Avenue branch location.

58. On or around November 17, 2025, at approximately 6:30 PM, GPS data shows the Fusion traveled from the Wayne Road address in Romulus, MI to the Monee, IL area, and then immediately returned to the Wayne Road, Romulus, MI address at approximately 3:19 AM on November 18, 2025.

59. The GPS tracker was observed traveling to a Pilot Travel Center located at 6002 W Monee Manhattan Rd., Monee, IL 60449, arriving at approximately 10:11 PM. The tracker then showed the Fusion departing the Pilot Travel Center at approximately 11:41 pm.

60. The GPS data did not show the Fusion making any stops during the trip to Monee, IL or the trip back to Romulus, MI.

61. Through video surveillance, members of TFG2 watched the Fusion return to the Wayne Road address.

62. TFG2 investigators observed the driver carry what appeared to be a bag or box from the Fusion to the residence.

63. At approximately 9:21 a.m., TFG2 members watched an individual exit the Wayne Road address and carry a box to the Toyota Prius registered to Al-Sarray.

64. At approximately 9:40 am, Romulus Police stopped the white 2015 Toyota Prius.

65. Romulus PD officers identified the driver and sole occupant of the white 2015 Toyota Prius as Al-Sarray.

66. A consensual search of Al-Sarray's vehicle uncovered five plastic bags containing bulk cash.

67. The amount of cash seized was defendant in rem $359,980.

68. Al-Sarray's cell phone was seized at the time of his arrest, and he consented to its search and an interview.

69. During the interview, Al-Sarray stated he was picking up cash from customers to buy cars as part of his business Brothers Auto Sales & Transportation and that he is the only person involved in the business.

70. However, a search of Al-Sarray's phone revealed conversations with Individual 4 from November 15–18, 2025, where Individual 4 directed Al-Sarray to

pick up bulk cash and included pictures of tokens for the cash pickups.

71. The messages contained no discussion of car purchases.

72. On November 19, 2025, TFG2 obtained seizure warrants for eight bank accounts associated with Al-Sarray, which had large cash deposits and transfers, including the defendant in rem bank accounts.

73. For example, bank records illustrate the following activity in the defendant in rem bank accounts:

a. **Key Bank, Business Acct. #XXXXXXXX7862, VL: $41,427.00**:

   i. From on or around August 14, 2025 to November 17, 2025, $1,652,132 cash was deposited in amounts ranging from $100 to $76,000.

   ii. From on or around August 26, 2025 to November 13, 2025, Al-Sarray purchased approximately 49 official checks for more than $10,000.

b. **PNC Bank, Business Checking Plus Acct. #XXXXXX5589, VL: $51,138.38**:

   i. From on or around July 24, 2025 to November 17, 2025, $1,764,910 cash was deposited in amounts ranging from $100 to $82,200.

   ii. From on or around September 3, 2025 to November 3, 2025,

Al-Sarray purchased approximately 15 cashier's checks for more than $10,000.

c. **DFCU Financial, Share/Deposit Acct. #XXXXX7544, VL: $42,659.53**:

   i. From on or around September 13, 2025 to November 6, 2025, at least $855,480 cash was deposited in amounts ranging from $15,000 to $75,000.

d. **First Merchants Bank, Business Interest Checking Acct. #XXXXX1664, VL: $3,608.82**:

   i. From September 8, 2025 to November 12, 2025, $1,115,575 cash was deposited in amounts ranging from $1000 to $78,000.

   ii. From on or around September 16, 2025 to November 5, 2025, Al-Sarray purchased approximately 21 official checks for more than $10,000.

74. The Fusion driven by Al-Sarray is registered to Individual 3.

75. Through an undercover law enforcement officer (UC), agents identified Individual 3 laundering drug proceeds.

76. In or around 2025, the UC was in contact with MLO members and learned of an upcoming money laundering transaction.

77. The UC learned the time and place of a meeting between Individual 3 and a drug trafficker.

78. The purpose of the meeting was for the drug trafficker to deliver cash drug proceeds to Individual 3 for laundering.

79. Individual 3 received the drug trafficking proceeds from the Detroit-area drug trafficker and money courier.

80. The receipt for the money transfer was the serial number of a dollar bill (token).

81. After Individual 3 received the cash, the UC confirmed from the MLO that money was laundered.

82. Trafficking drugs and laundering the proceeds are SUAs as defined by 18 U.S.C. § 1956(c)(7).

83. At all relevant times, Al-Sarray used the Ford Fusion with Michigan license plate ECP154, which is registered to Individual 3.

84. At all relevant times, Al-Sarray had his business, Brothers Auto Sales & Transportation LLC, registered to 10XXX Wayne Road, Romulus, MI, which is the same address at which Individual 3 has two businesses registered.

85. Al-Sarray's phone contained documentation showing payments between Al-Sarray and a business registered to Individual 3.

86. Consequently, the Defendants in rem were involved in a violation or

violations of 18 U.S.C. §§ 1956, 1957 and are therefore subject to federal forfeiture under 18 U.S.C. § 981(a)(l)(A).

## CLAIM FOR RELIEF

87. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88. The Defendants *in rem* are forfeitable to the United States of America under 18 U.S.C. §§ 981(a)(l)(A) and 984 because they were involved in a violation or violations of 18 U.S.C. §§ 1956, 1957.

## CONCLUSION

Plaintiff respectfully requests that this Court issue a warrant for arrest of the Defendant *in rem*; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* condemned and forfeited to the United States for disposition according to law; and, that the United States be granted such further relief as this Court may deem just and proper, together with costs and disbursements of this action.

/

/

/

/

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney

S/ Zachary A. Kitzmiller
Zachary A. Kitzmiller (P87845)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-0210
Zachary.Kitzmiller@usdoj.gov

Dated: November 19, 2026

**VERIFICATION**

I, Tyler Hay, state that I am a Special Agent with the Drug Enforcement Administration. I have read the foregoing Complaint for Forfeiture and declare under penalty of perjury that the facts contained therein are true and correct based upon knowledge possessed by me and/or upon information received from other law enforcement agents.

Tyler Hay, DEA

Dated: November 19, 2026